UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
ESTEBAN GONZALEZ,                                  :
                                                   :
                        Petitioner,                :
                                                   :
              -v.-                                 :
                                                   :
UNITED STATES OF AMERICA,                          :
                                                   :
                        Respondent.                :
------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/29/13

**REPORT AND RECOMMENDATION**

12 Civ. 5226 (JSR) (JLC)
94 Cr. 134 (JSR)

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Jed S. Rakoff, United States District Judge:**

Petitioner Esteban Gonzalez ("Gonzalez") brings this motion for relief pursuant to 28

U.S.C. § 2255 to vacate, set aside, or correct his sentence for possessing a firearm after having

been previously convicted of a felony.  Gonzalez argues that (1) his due process rights were

violated by the Government's failure to disclose impeachment evidence concerning a key

prosecution witness, as required by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny; and

(2) his Sixth Amendment rights were violated because his attorney at trial was ineffective in

failing to, inter alia, conduct a proper investigation into the facts of his case or properly cross-

examine witnesses.  Gonzalez requests a new trial, or in the alternative, a dismissal of the

indictment.  On July 6, 2012, the Honorable Jed S. Rakoff referred Gonzalez's motion to me for

a Report and Recommendation and also referred the case for general pretrial supervision.  For

the reasons set forth below, I recommend that Gonzalez's motion be denied.

1

USDC SDNY
DATE SCANNED  8/29/13

# I.  BACKGROUND

## A.    Gonzalez's Trial

On March 16, 1994, the Government charged Gonzalez with one count of possession of a firearm after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). (94 Cr. 134; Dkt. No. 11).  Gonzalez and a co-defendant, Alfredo Colon ("Colon"), were tried together in October and November 1994 before the Honorable Whitman Knapp.  See United States v. Gonzalez, 110 F.3d 936 (2d Cir. 1997) ("Gonzalez I").  Gonzalez's trial and related proceedings have been described at length in previous court decisions and so only the facts that bear on Gonzalez's current motion for post-conviction relief will be repeated here.

### 1.  Officer Crowe's Testimony

The Government presented testimony from an off-duty NYPD police officer, Thomas Crowe ("Crowe" or "Officer Crowe"), who lived on Lafayette Avenue in the Bronx.  Crowe testified as follows: at around 11:00 p.m. on February 24, 1994, he noticed three men—later identified as Colon, Gonzalez, and Gonzalez's brother Emilio ("Emilio")—loitering outside his building.  (Tr. 67-78; 336-37).[1]  Crowe watched the men from a window for several minutes and saw them acting suspiciously in various ways, including driving back and forth down the street without headlights in two separate cars, ducking behind parked cars, and peering into the windows of a nearby house.  (Tr. 68-73, 75-76, 78).  After making an unsuccessful attempt to

---

[1] "Tr." refers to the transcript of Gonzalez's trial in October and November 1994.  References to post-conviction proceedings between 2000 and 2003 are cited as "PC Tr." along with the date of the proceeding.

call 911 (Tr. 78), Crowe retrieved his off-duty revolver and his police shield (Tr. 76-77), and went outside to confront Gonzalez and Colon. (Tr. 79).[2]

Crowe testified that when he got outside, he saw both Colon and Gonzalez running towards him with guns in their hands. (Tr. 79-80). Crowe identified himself as a police officer and told Gonzalez and Colon to stop. (Tr. 80). Gonzalez fired a shot at Crowe, but missed. (Id.). Crowe ducked behind a car and fired two shots in return, but did not hit anyone. (Id.).

After the shooting, Colon and Gonzalez ran down Lafayette Avenue and Crowe chased after them. (Tr. 80-82). Crowe testified that during the chase, he saw Colon and Gonzalez toss their guns into some bushes in a nearby yard. (Tr. 80-81.). Gonzalez managed to flee, but Crowe eventually caught up to Colon, knocked him to the ground, and held him at gunpoint. (Tr. 82).

Without handcuffs to arrest Colon, Crowe walked him at gunpoint back towards his building. (Tr. 83). As they reached the building, Crowe saw two police officers from the 45th Precinct, Valerie Parks ("Parks") and Jeffrey Sapienza ("Sapienza"), arriving in a marked patrol car. (Tr. 84).[3] Crowe turned Colon over to Parks and Sapienza to be handcuffed and arrested. (Tr. 84-85). Immediately thereafter, Crowe walked across the street to look for the guns that he had seen Colon and Gonzalez toss away. (Tr. 84-86). Crowe testified that he found one of the guns, a 9 millimeter semi-automatic pistol with a defaced serial number, in bushes across from his building. (Tr. 85-86).

---

[2] By this time, Emilio had left the scene. (Tr. 76).

[3] Parks and Sapienza had come to the area because they were investigating an attempted burglary at the nearby home of George Mascia, as described further below. (See Tr. 52-53, 379-80).

Crowe provided descriptions of Gonzalez and his brother, and the cars that he had seen them driving earlier—a red and silver Chevy Baretta and a white Corsica with Connecticut license plates. (See, e.g., 175). These descriptions were broadcast over police radio, and shortly thereafter, Crowe was told that officers had stopped a white Corsica with Connecticut plates nearby. (Tr. 91). The officers brought the driver of the white Corsica, later identified as Emilio Gonzalez, to the front of Crowe's house and Crowe identified him as one of the men he had seen earlier in the evening. (Id.). Approximately 20 to 30 minutes later, Crowe received word that officers had stopped a red and silver Chevy Baretta a few miles away on Tremont Avenue. (Tr. 102). Crowe went to the scene of the car stop and identified the driver of the Baretta, Esteban Gonzalez, as the person who had shot at him. (Tr. 103). At some point, Officer Crowe learned that Esteban and Emilio Gonzalez were brothers. (See Tr. 76; see also Tr. 336-37 (stipulation at trial that Emilio and Esteban Gonzalez are brothers)).

### 2. Officer Sapienza's Testimony

Officer Sapienza testified that at around 11:50 p.m. on February 24, 1994, he and his partner responded to a report of a burglary in progress at 862 Throgs Neck Expressway in the Bronx. (Tr. 379-80). When they arrived at the location, the officers learned that a burglar had fled the scene a few minutes earlier. (Id. at 380). The officers decided to drive around the area looking for the suspect (id.), and after turning the corner onto Lafayette Avenue, they saw Officer Crowe holding Colon at gunpoint. (Tr. 381). Crowe identified himself as a police officer, displayed his police shield, and said that he needed handcuffs in order to arrest Colon for gun possession. (Id.). After Sapienza handcuffed Colon (id.), Crowe went to look for guns in a yard across the street. (Tr. 382). Sapienza saw Crowe walk across the street, reach behind a fence, and retrieve a black handgun from an area with bushes. (Id.). Crowe told Sapienza that in

4

addition to Colon, there were two other suspects who had already left the scene. (Tr. 384).

### 3. George Mascia's Testimony

George Mascia ("Mascia") testified that he lived at 862 Throgs Neck Expressway, near the intersection of the Throgs Neck Expressway and Lafayette Avenue. (Tr. 52, 59). At around 11:00 or 11:30 p.m. on February 24, 1994, his home security alarm went off. (Tr. 52-53). After locking his wife and granddaughter in an upstairs bedroom, Mascia went downstairs to the first floor of his house, which was rented out to a tenant as a separate apartment. (See Tr. 52-53). Mascia saw "a figure" climbing out of a first-floor window and so he ran back upstairs. (Id.). Mascia's security company called the police, and several police officers arrived at Mascia's home shortly thereafter. (Tr. 53). Later that night, the officers brought Mascia to the intersection of Lafayette Avenue and the Throgs Neck Expressway to look at some suspects, but Mascia could not identify any one of them as the person he had seen climbing out of his window. (Tr. 61-62). When asked during cross-examination whether he recognized Gonzalez in the courtroom, Mascia responded that he "[n]ever saw him before in my life." (Tr. 62).

### 4. Officer Donohue's Testimony

An officer from the NYPD Emergency Services Unit, Kevin Donohue ("Donohue" or "Officer Donohue"), testified that he assisted in processing the crime scene and, with the benefit of a floodlight, he found a second 9 millimeter handgun in roughly the same place that Crowe had found the first 9 millimeter pistol. (Tr. 495-96). Donohue testified that the police did not find any spent shell casings or evidence of ballistic damage caused by shots fired, but explained that it had been snowing that evening and the snow hampered their search. (Tr. 503-05).

5

5. Officers Argiento and Coakley's Testimony

Police Officers Ralph Argiento ("Argiento") and William M. Coakley ("Coakley"), who were on duty that night in the Bronx, testified that they heard over police radio that other officers were looking for a white Corsica and a red Baretta. (Tr. 244; 331). Argiento and Coakley further testified as to how Esteban and Emilio Gonzalez were pulled over in two separate cars based upon Crowe's descriptions and as to the process by which Crowe identified each of the brothers. (Tr. 244-48; 330-31).

6. The Defense Case

The defense theory offered at trial was that Crowe harbored ethnic biases, and that when he saw Colon, Gonzalez, and Emilio on his block, he assumed they were suspicious simply because they were Latino. (See Tr. 646) (arguing Crowe "came out of his house, half cocked, with a weapon drawn" when he "saw Latinos in his neighborhood"). According to the defense, Crowe improperly profiled Gonzalez and Colon, shot at them, and then concocted a story about a mutual shoot-out so as to avoid getting into trouble. (Tr. 646-47, 679-80, 684-85). Colon and Gonzalez also asserted that Crowe kept a large number of guns at home, and that he planted the two 9 millimeter guns in the bushes in order to make his story about a shoot-out seem plausible. (See, e.g., Tr. 646-48, 682).

The defense called several witnesses to cast doubt on the Government's depiction of the shooting and identification of Gonzalez as the shooter. The defense presented testimony from Crowe's girlfriend, Susan Jennifer Woelfle ("Woefle"), who testified that she lived with Crowe and was at home on the evening of February 24, 1994. (Tr. 297-98, 302). Woefle testified that she called 911 at Crowe's request after he told her there were some suspicious people outside (Tr. 308-09), but that she did not hear any gunshots. (Tr. 306, 311). The defense also called a

6

forensic expert, Vincent J. Scalice, who testified that latent fingerprints can be recovered from handguns (Tr. 567), and suggested that the Government should have done much more to obtain and preserve physical evidence at the scene. (See, e.g., Tr. 585-86). Scalice testified further that a suspect's hands can be tested for gun powder residue. (Id.). Based upon Scalice's testimony, the defense argued that the police mishandled the crime scene and pointed out that the Government did not find any fingerprints that matched Gonzalez, either on the guns or in Mascia's home. (See Tr. 706-09).

In addition, the defense called Gregory Domenech ("Domenech"), a New York City employee, who testified that he had gone to visit a friend who lived in Crowe's neighborhood on the evening of February 24, 1994 to watch a Knicks basketball game. (Tr. 534-35). After the game, Domenech and another friend, Al, left to go home and were walking towards Domenech's car when they were stopped and questioned by police officers. (Tr. 535). The officers said that Domenech and Al "fit the description" of men who had been involved in a shooting with a police officer. (Id.). Domenech described Al as "a black male, five eight, five nine, about 188, 185 pounds," and described himself as "six feet tall" and "two seventy, 280 pounds." (Id.). After a lieutenant spoke with the friend whom Domenech and Al had been visiting that evening, the officers let Domenech and Al go. (Tr. 538).

The defense also offered evidence of several of Crowe's prior statements: a tape of Crowe's statement during a hearing conducted by the NYPD concerning the propriety of Crowe's discharge of his weapon (Tr. 169-70), a stipulation regarding Crowe's statements to Assistant United States Attorney Jeremy Temkin (Tr. 540-41), and testimony by Special Agent Robert Berger of the Bureau of Alcohol, Tobacco, and Firearms regarding his conversations with Crowe in the course of preparing the complaint against Gonzalez and Colon. (Tr. 542-47; 553-

7

57). During cross-examination, the defense questioned Crowe regarding the inconsistencies between details provided in these prior statements and his trial testimony. (See, e.g. Tr. 149-69, 177-81, 542-44). Specifically, Crowe acknowledged, inter alia, that he had provided varying information with regard to when and where he first saw that Gonzalez and Colon had guns (Tr. 145-46), whether Gonzalez had one gun or two (Tr. 165, 173-75, 202-04), the circumstances under which he first noticed Colon, Gonzalez, and Emilio outside his building (Tr. 147-48), and the foot chase that preceded Colon's arrest. (Tr. 199). The defense also cross-examined Crowe regarding the NYPD's internal inquiry into his role in the shooting, and the possible professional consequences for Crowe if his actions with respect to the shooting were found to be unjustified. (See, e.g., Tr. 135-47).

In summation, the defense emphasized that there were no fingerprints tying Gonzalez and Colon to the guns that were allegedly found at the scene, there was no physical evidence to support the Government's theory of a shoot-out, and a shooting was never reported by Woelfle in her call to 911 or over police radio. (Tr. 682, 701, 703, 708). The defense also focused on the multiple discrepancies between Crowe's trial testimony and his various prior statements about the incident, arguing that he had changed his story again and again and was "a liar." (Tr. 710; see also Tr. 649-52, 680, 686-87, 691-99, 709).

### 7. Disposition and Sentence

On November 1, 1994, after a seven-day jury trial, Gonzalez and Colon were convicted as charged. See Gonzalez I, 110 F.3d at 939. Judge Knapp sentenced Gonzalez to 180 months imprisonment and five years of supervised release, a downward departure from the Guidelines' range of 235 to 290 months. Id. at 939, 948. Colon was sentenced to 92 months imprisonment and three years of supervised release. Id. at 939.

8

### B.    First Direct Appeal

Gonzalez timely appealed his conviction to the Second Circuit. See id. The Government
cross-appealed, alleging that the district court had erred by sentencing Gonzalez to only 180
months. See id. at 948. The Second Circuit upheld the conviction, but vacated and remanded for
re-sentencing because the district court had not explained the downward departure from the
sentencing guidelines. Id.

### C.    First Remand for Resentencing

After Gonzalez's trial, it came to light that both Gonzalez and his trial attorney, Pasquale
Stiso ("Stiso"), had been involved in a Bronx racketeering enterprise led by Francisco Maisonet,
which was known as the "Maisonet Organization." See United States v. Gonzalez, 285 F. Supp.
2d 357, 367 (S.D.N.Y. 2003) (hereinafter, "Gonzalez II"). The Maisonet Organization
"distributed illegal drugs at various locations in the Bronx" and "also used violence as a means
of furthering its unlawful goals." Id. (citation omitted). On August 12, 1998, Stiso pled guilty in
the Southern District of New York to four counts related to his involvement in the Maisonet
Organization: conspiracy to violate the narcotics laws of the United States, conspiracy to commit
obstruction of justice, and two counts of obstruction of justice. Id. at 362, 370.

While Gonzalez's case was pending before Judge Knapp on remand, but prior to re-
sentencing, Gonzalez filed a motion for new trial or, in the alternative, for post-conviction relief
pursuant to 28 U.S.C. §§ 2241 and 2255. Gonzalez asserted several claims based on new
evidence, including that Stiso rendered ineffective assistance at trial because his loyalty had been
given to Francisco Maisonet and the Maisonet Organization, not to Gonzalez. See Gonzalez II,
285 F. Supp. 2d at 359. On September 25, 2003, after granting discovery and holding a lengthy
evidentiary hearing with regard to Stiso's representation of Gonzalez, Judge Knapp denied the

9

motion. Id. at 379 ¶ 54. Judge Knapp found that Gonzalez's motion for a new trial was untimely and that his alternative motion pursuant to 28 U.S.C. §§ 2241 and 2255 failed on the merits. Specifically, Judge Knapp found that Gonzalez failed to establish that Stiso suffered from "divided loyalties" or that his representation of Gonzalez otherwise "fell below the Strickland standard of 'objective reasonableness.'" Gonzalez II, 285 F. Supp. 2d at 360, 379 ¶ 53 (internal citation omitted); see also id. at 364, 366.[4]

Judge Knapp subsequently retired without resentencing Gonzalez, and the case was reassigned to Judge Mukasey. After additional motion practice that is not relevant here and is discussed in United States v. Gonzalez, 421 F. Supp. 2d 727, 730-37 (S.D.N.Y. 2006) ("Gonzalez III"), Judge Mukasey sentenced Gonzalez to 210 months imprisonment and three years of supervised release on September 6, 2006. See United States v. Gonzalez, 291 Fed. App'x. 392, 393 (2d Cir. 2008) ("Gonzalez IV"). At the time of sentencing, Gonzalez was serving an unrelated 150-month sentence for a prison assault that had occurred in 2000. See id. at 394-95. Judge Mukasey ordered that the 210-month sentence run consecutively to the 150-month sentence for assault, explaining that he was following the wishes of the sentencing judge in the assault case, who had wanted the two sentences to be served consecutively. Id.

### D.   Second Direct Appeal

Gonzalez appealed the rulings by both Judge Knapp and Judge Mukasey to the Second Circuit. The Circuit found that because Gonzalez filed his motion for post-conviction relief

---

[4] Although Gonzalez asserted several bases for his ineffective assistance of counsel claim, the "evidentiary hearing was limited to the question of whether [] Stiso had become involved in Francisco Maisonet's criminal activities prior to [Gonzalez's] trial," thus creating a conflict of interest. Id. at 359-60 (internal quotation marks and citation omitted). The Court ultimately concluded that "Stiso's criminal conduct was temporally and factually distinct from that of Gonzalez" and that there was no conflict of interest. Id. at 378.

before he had been re-sentenced, his motion had been premature and Judge Knapp did not have jurisdiction to adjudicate it on the merits. See Gonzalez IV, 291 Fed. App'x. at 393-94. The Circuit therefore vacated the portion of Gonzalez II that denied relief on the merits and held that Gonzalez could still bring his ineffective assistance of counsel claim in a future habeas petition. Id. In addition, the Circuit found that the district court had erred in its analysis as to whether Gonzalez's 210-month sentence should be served consecutively to his 150-month sentence for assault, and remanded the case for further consideration as to whether all or some portion of the sentences should be served concurrently. Id. at 395.

### E.    Second Remand for Resentencing

Upon remand, the case was reassigned to Judge Rakoff following Judge Mukasey's retirement. After additional sentencing proceedings, including a hearing pursuant to United States v. Fatico, 603 F.2d 1053 (2d Cir. 1979), the Court "split [Gonzalez's 210-month] sentence, so that 105 months were made to run concurrent with, and 105 months consecutive to, the [150-month] sentence imposed [for assault] . . ." United States v. Gonzalez, No. 94 Cr. 134 (JSR), 2010 WL 1631496, at *4 (S.D.N.Y. Apr. 20, 2010) ("Gonzalez V"). Gonzalez's sentence was affirmed by the Court of Appeals on March 24, 2011. United States v. Gonzalez, 415 Fed. App'x. 336, 337 (2d Cir. 2011) ("Gonzalez VI").

### F.    The Instant Petition

Gonzalez filed a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255 on June 22, 2012. (See Notice of Motion ("Pet. Mot.") (94 Cr. 134, Dkt. No. 244)).[5] He argues that his conviction should be vacated because the Government failed to disclose

---

[5] As explained in the Court's Memorandum Order of May 23, 2013, the Government does not challenge the timeliness of Gonzalez's motion. See United States v. Gonzalez, 2013 WL 2350434, at *3 n.2 (S.D.N.Y. May 23, 2013) (hereinafter, the "May 23 Memorandum Order").

impeachment evidence that allegedly could have been used to undermine the credibility of

Officer Crowe, thus violating his rights under <u>Brady</u>. (<u>See</u> Memorandum in Support of

Petitioner Esteban Gonzalez's Motion Pursuant to 28 U.S.C. § 2255, filed June 22, 2012 ("Pet.

Mem.") (94 Cr. 134, Dkt. No. 246), at 2-19). He also contends that his trial lawyer, Stiso,

rendered ineffective assistance in violation of the Sixth Amendment. (<u>Id.</u> at 20-37). Judge

Rakoff referred Gonzalez's motion to me for a Report and Recommendation and for general

pretrial supervision in an Order of Reference dated July 5, 2012. (12 Civ. 5226, Dkt. No. 4). On

September 18, 2013, Gonzalez filed a supplemental memorandum of law in support of his

motion. (Supplemental Memorandum and Exhibits in Support of Petitioner Esteban Gonzalez's

Motion Pursuant to 28 U.S.C. § 2255, filed September 18, 2013 ("Pet. Supp. Mem.") (94 Cr.

134, Dkt. No. 268)). The Government filed opposition papers on October 9, 2013

(Memorandum of Law of the United States of America ("Resp. Mem.") (12 Civ. 5226, Dkt. No.

8)), and Gonzalez filed reply papers on December 6, 2012. (Reply Memorandum in Support of

Petitioner Esteban Gonzalez's Motion Pursuant to 28 U.S.C. § 2255, filed December 6, 2012

("Pet. Reply Mem.") (94 Cr. 134, Dkt. No. 274)).

By letter dated January 23, 2013, Gonzalez moved to compel discovery of various

records from the New York City Police Department ("NYPD") and Internal Affairs Bureau

("IAB") in support of his <u>Brady</u> claim. (Letter from Michael A. Young ("Pet. January 23

Letter") (94 Cr. 134, Dkt. No. 276)). The Government submitted opposition papers on February

5, 2013 (Letter from John J. O'Donnell ("Resp. February 5 Letter") (94 Cr. 134, Dkt. No. 280)),

and Gonzalez submitted a letter in reply. (Letter from Michael A. Young, dated February 25,

2013 ("Pet. February 25 Letter") (94 Cr. 134, Dkt. No. 279)).

In a Memorandum Order dated May 23, 2013, I granted limited discovery of IAB records pertaining to Crowe's disciplinary history, denied Gonzalez's remaining discovery requests, and requested additional briefing as to Gonzalez's Brady claim. May 23 Memorandum Order, 2013 WL 2350434, at *11-12. In addition, because Crowe's IAB records are confidential personnel records, I directed that the records be produced to the Court to be reviewed in camera. Id. Both Gonzalez and the Government moved for reconsideration. (12 Civ. 5226, Dkt. Nos. 20, 23). I denied reconsideration in an Order dated July 9, 2013 (12 Civ. 5226, Dkt. No. 27), and the NYPD Legal Bureau subsequently produced responsive documents to the Court on July 19 and August 8, 2013. These records have been reviewed in camera and are discussed infra, in Section II(E).

## II.    GONZALEZ'S CLAIMS PURSUANT TO **BRADY V. MARYLAND**

Gonzalez contends that his rights under Brady were violated because the Government did not turn over evidence which, he alleges, "would have destroyed the credibility of the government's principal witness, police officer Crowe." (Pet. Mem. at 2). Gonzalez argues that the Government improperly withheld three types of impeachment evidence with regard to Crowe. First, he claims that the Government should have disclosed Crowe's disciplinary records from the Civilian Complaint Review Board ("CCRB"), which included two substantiated complaints. (See Pet. Mem. at 2-7; Pet. Reply Mem. at 2, 5-8). Second, Gonzalez contends that the Government was aware of problems with Crowe's veracity, as evidenced by the 1996 testimony of a Government witness, James Rodriguez, who testified in an unrelated case that he was falsely charged with attempted murder of a police officer based in part on false statements by Crowe. (See Pet. Mem. at 7-8; Pet. Reply Mem. at 8-13 & Exs. D-F). Third, Gonzalez

13

claims that the Government suppressed a police report that incorrectly stated that Officer Donohue had found a 9 millimeter shell casing at the scene.  (See Pet. Reply Mem. at 14).

## A.    Legal Standards

Brady v. Maryland and its progeny stand for the proposition that the Government has a duty to provide to the defense any evidence that is both favorable to the accused and material to either guilt or punishment.  373 U.S. 83, 87 (1963); see also United States v. Mahaffy, 693 F.3d 113, 127 (2d Cir. 2012) (citing United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004)).  "Evidence is favorable if it is either exculpatory or impeaching," Mahaffy, 693 F.3d at 127 (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)); "it is material if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Mahaffy, 693 F.3d at 127 (quoting Youngblood v. West Virginia, 547 U.S. 867, 870 (2006)).  To prove materiality, a habeas petitioner does not need to prove "'by a preponderance [of the evidence] that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.'"  Id. (quoting Youngblood, 547 U.S. at 870 (additional quotation marks omitted)).  However, a petitioner must demonstrate "'that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  Id.

In addition, "[t]o establish a Brady violation, '[t]he evidence at issue . . . must have been suppressed by the State, either willfully or inadvertently . . . .'"  United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002) (quoting Strickler, 527 U.S. at 281–82).  Where evidence is not disclosed, it is "suppressed for Brady purposes even when it is 'known only to police investigators and not to the prosecutor.'"  United States v. Triumph Capital Grp., Inc., 544 F.3d 149, 161 (2d Cir. 2008) (quoting Kyles v. Whitley, 514 U.S. 419, 438 (1995)).  A prosecutor has "'a duty to learn

of any favorable evidence known to the others acting on the government's behalf,'" Strickler,

527 U.S. at 281 (quoting Kyles, 514 U.S. at 437), and "is presumed to have knowledge of all

information gathered in connection with the government's investigation." United States v.

Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) (citing Kyles, 514 U.S. at 438).

**B.     Failure to Disclose Officer Crowe's CCRB Records**

As discussed in the May 23 Memorandum Order, prior to trial, Gonzalez asked the

Government to produce "[c]opies of any and all complaints and disciplinary reports relating to

any and all officers involved in this case, including but not limited to those on record at . . . [the]

internal affairs division, . . . and the civilian complaint review [b]oard." (See Exhibits to

Affirmation by Michael A. Young, Esq. in Support of Motion Pursuant to 28 U.S.C. § 2255,

filed June 25, 2012 ("Young Affirmation Exs.") (Dkt. No. 265), Ex. G (Letter from Pat V. Stiso

to Assistant United States Attorney Jeremy Temkin, dated September 10, 1994, at ¶ 6)).  In

addition, Gonzalez made a general request for impeachment evidence.  (Id. (Letter from Pat V.

Stiso to Assistant United States Attorney Jeremy H. Temkin, dated April 11, 1994, at ¶ 24)).  In

response, the Government informed Gonzalez that it did not have any disciplinary reports

relating to officer witnesses but "[t]o the extent the Government becomes aware of such reports

it will produce them to the extent such production is consistent with the Government's

obligations under Brady v. Maryland and its progeny." (Pet. Supp. Mem. Exs., Ex. B (Letter

from Assistant United States Attorney Jeremy H. Temkin dated Sept. 19, 1994 responding to

Gonzalez and Colon's discovery requests)).

Several years later, Gonzalez gained access to Crowe's CCRB records after Judge Knapp

granted limited discovery during the post-conviction proceedings held between 2000 and 2003.

(See PC Tr. May 30, 2002, at 52).  Gonzalez now asserts that, had the CCRB records been

15

disclosed earlier, they could have been used to cross-examine Crowe or to uncover other impeachment evidence. The discussion that follows addresses four CCRB complaints against Crowe, whether the Government suppressed these complaints, and the potential effect of these complaints had they been turned over to the defense prior to trial.[6]

### 1.  The CCRB Complaints Against Officer Crowe

#### a.  The Angel Alejandro Complaint

On April 5, 1989, Angel Alejandro ("Alejandro") complained to the CCRB that he was a potential witness in a criminal trial and that Officer Crowe had been harassing him because Alejandro "didn't want to lie for [the police]." (See Declaration of John J. O'Donnell, filed October 9, 2012 ("O'Donnell Decl.") (94 Cr. 134, Dkt. No. 271), Ex. C at AA45). As an example of the alleged harassment, Alejandro described an incident on April 4, 1989. Alejandro said that he was on his way home when he saw Crowe, who was wearing civilian clothes and driving a black Grand National sedan. (Id., Ex. C at AA 49). From the car, Crowe allegedly called Alejandro a "faggot" and said that "on the outside he [Crowe] was the jury . . ." (Id.). Alejandro claimed that Crowe jumped out of the car and chased him into his apartment building. At one point, Crowe allegedly grabbed Alejandro's wrist, but Alejandro pulled away. (Id.). Alejandro was not taken into custody, and he reported the alleged incident to the CCRB the next day. (Id., Ex. C at AA15, AA46).

A CCRB investigator, Sergeant Kelly, interviewed Officer Crowe about Alejandro's allegations on June 1, 1989. (Id., Ex. C at AA53). Crowe denied seeing Alejandro on April 4,

---

[6] Gonzalez asserts that the CCRB investigated ten complaints against Crowe between June 1987 and March 1994. (Pet. Mem. at 6). However, he does not provide any details or records regarding six of the ten complaints. Accordingly, I will consider only the four complaints for which Gonzalez has provided records.

and stated that he was home sick that day and did not leave his apartment at all. (Id., Ex. C at AA16, AA49, AA50). Officer Crowe acknowledged, however, that he owned a black Grand National sedan. (Id., Ex. C at AA49). Sergeant Kelly also interviewed an eyewitness, Keith Eberhardt, who knew Alejandro. Eberhardt told Sergeant Kelly that he was standing outside of Alejandro's apartment building talking to a woman named "Rosie" when he saw a black car pull up across the street. (Id., Ex. C at AA37). The driver of the black car was a Caucasian man with brown hair who appeared to be in his late twenties. (Id.) Around the same time, Eberhardt saw Alejandro walk down the street and then start talking to the driver of the black car. (Id.). Eberhardt then observed Alejandro get into an argument with the driver and heard Alejandro curse at him, following which the driver got out of his car and chased Alejandro into the building. (See id., Ex. C at AA17-18, 37). The CCRB later sought to re-interview Eberhardt to determine whether he could identify Crowe in a photo array, but could not find him. (See id., Ex. C at AA 13, 19-20, 22-26). The CCRB was also unable to locate or interview "Rosie." (See id., Ex. C at AA49).

The CCRB ultimately found the allegations against Crowe to be "substantiated" and recommended that he face disciplinary charges. (Id., Ex. C at AA1; see also id., Ex. C at AA4-AA8). From the record before the Court, it appears that the CCRB did not issue a report or any other detailed findings to explain its decision. Rather, the CCRB's decision was simply memorialized in a check mark on the cover sheet of the investigative file, and in the voting sheets of the three CCRB Board members who were responsible for substantiating the complaint. (See id. at AA1 (cover sheet showing check mark in box labeled "Disciplinary Action – Yes"); id. at AA4-AA8 (Board member voting sheets with marks showing complaint should be substantiated)). One Board member wrote on his voting sheet, "Crowe says no one knows his

17

[personal] car, yet complainant accurately describes it.  Crowe has no corroboration that he was home . . . C[omplainant]'s witness describes Crowe . . ."  (Id. at AA7).  Another Board member wrote that the "[f]act that [Alejandro] said car was a 'Grand National' & Cop drives same car lends to [Alejandro's] credibility.  Grand Nat'l is an unusual car."  (Id. at AA8).  There is nothing before the Court to establish that the NYPD took any action against Crowe in response to the CCRB's recommendation that he be disciplined.  (See Resp. Mem. at 24 (Government's brief asserting that "the NYPD has no record of what action, if any, the NYPD took with respect to the complaint.")).

> b.  Reinaldo Ortiz Complaint

On November 12, 1992, Reinaldo Ortiz ("Ortiz"), a taxi driver, complained that Crowe and another police officer pulled him over, yanked him out of his taxi, pushed his face against a car, punched him, arrested him, and hit him with a radio and a flashlight.  (O'Donnell Decl., Ex. D at RO 17, 21, 27).  In contrast, Crowe told the CCRB that he and his partner, Officer Henry Ramirez, pulled Ortiz over because Ortiz was intoxicated and nearly hit their patrol car.  (Id. at RO 3-4, 30-31).  The officers asserted that Ortiz was violent from the outset, tried to attack them with a baseball bat, and tried to strike Officer Ramirez with a bottle.  (Id. at 3, 12, 51, 102-04).  The officers contended that while they did use force to protect themselves while bringing Ortiz into custody, it was a justified response to the force used by Ortiz.  (Id. at 106-07).  In addition to Ortiz and the officers, the CCRB interviewed a bystander, Lawrence Phifer, who corroborated much of Ortiz's account.  (Id. at RO 23-25, 70).

Without making an express credibility finding, the CCRB found Ortiz's claims "substantiated" and referred the matter to the Department Advocate's Office to bring disciplinary charges against both officers.  (See Id. at 1, 72, 87).  However, during subsequent NYPD

18

disciplinary proceedings in 1994, the officers presented testimony from another eyewitness, Richard Lefkowitz, who corroborated the officers' accounts that Ortiz had wielded a baseball bat. (O'Donnell Decl., Exhibit H, at 11). The officers also presented evidence that Officer Ramirez had been injured during Ortiz's arrest, and that Ortiz had eventually been found guilty of assaulting Officer Ramirez. (Id. at 19-20). Assistant Deputy Police Commissioner Kevin Lubin therefore found both officers not guilty of the charges against them. (Id. at 2-3, 19-22).

### c. Gloria Allen Complaint

On June 3, 1987, Gloria Allen ("Allen") alleged that a male officer from the 52nd Precinct—identified by the CCRB as Officer Crowe—struck her son with a nightstick and called him a "n-----." (See O'Donnell Decl., Ex. E). Allen did not witness the incident herself and was reluctant to allow the CCRB to interview her son. (Id.). After numerous unsuccessful attempts to set up an interview with Allen and her son, the CCRB closed its investigation with the designation "complainant uncooperative." (Id.).

### d. Javier Zavala Complaint

On July 30, 1990, Javier Zavala ("Zavala") claimed that he saw two officers issuing a traffic ticket to a woman that he knew. (See O'Donnell Decl., Ex. F). The officers were "har[]as[sing]" the woman and allegedly made her "so nervous she couldn't find her license." (Id.). Zavala walked over to the officers and asked for their names and badge numbers, but the officers were disrespectful and refused to provide the information. As the officers left, Officer Crowe allegedly said to Zavala in Spanish, "Don't f--- with me." (Id.).

Zavala agreed to resolve the complaint through an alternative dispute resolution process known as conciliation. (Id.). On November 11, 1990, Crowe attended a conciliation session at the CCRB, where he stated that he did not speak Spanish and did not remember the incident in

19

question. (Id.). The complaint was subsequently closed with the designation that it had been "conciliated." (Id.).

### 2. The Government Suppressed Crowe's CCRB Records

As a threshold matter, to establish a Brady violation, Gonzalez must prove that "the Government, either willfully or inadvertently, suppressed evidence . . . .'" United States v. Bryant, No. 11–5452–cr, 2013 WL 1316921, at *2 (2d Cir. Apr. 3, 2013) (quoting United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001)); see also Strickler, 527 U.S. at 281–82. The Government has acknowledged that it did not produce Crowe's CCRB records to Gonzalez, despite his pre-trial requests for them. (See Memorandum of Law of the United States of America in Support of Its Motion for Reconsideration, filed June 5, 2013 ("Resp. Reconsideration Mem.") (12 Civ. 5226, Dkt. No. 21), at 8-9). However, in order to prove that the CCRB records were "suppressed" for Brady purposes, Gonzalez must also establish that the records were in the prosecutor's possession, known to the prosecutor, or that knowledge of the records should be imputed to the prosecutor, e.g., because the records were known to other members of the "prosecution team." United States v. Meregildo, 920 F. Supp. 2d 434, 440-41 (S.D.N.Y. 2013); see also Strickler, 527 U.S. at 280-81; Kyles, 514 U.S. at 437-38; United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998).

In the May 23 Memorandum Order, I noted that the parties had not "specifically addressed whether the prosecutors were aware of Crowe's CCRB disciplinary records, or whether Crowe was part of the 'prosecution team' such that knowledge of his CCRB records should be imputed [to the prosecutor] for Brady purposes." (May 23 Memorandum Order, 2013 WL 2350434, at *9). I therefore directed the parties to provide additional submissions as to whether the prosecutors were actually or constructively aware of Crowe's CCRB records. (Id.).

In its subsequent submission, the Government denied that the prosecutors were personally aware of the CCRB records, but acknowledged that Crowe should be considered a member of the federal "prosecution team" due to his central role in the criminal investigation and prosecution of Gonzalez. (Resp. Reconsideration Mem at 10-11). Gonzalez agreed that Crowe was a member of the "prosecution team" for Brady purposes. (See Memorandum of Petitioner Esteban Gonzalez . . . [as to] Whether Officer Crowe Was a Member of the Prosecution Team, dated June 6, 2013 ("Pet. June 6 Mem.") (Dkt. No. 29), at 2). Accordingly, I consider Crowe to have been a member of the "prosecution team," and will impute Crowe's knowledge of impeachment evidence to the prosecutor. See Meregildo, 920 F. Supp. 2d at 440-41. Based on Crowe's knowledge of his own disciplinary proceedings before the CCRB, Gonzalez's pre-trial requests for Crowe's CCRB records (which put the Government on notice that such records might be worthy of review), and the Government's failure to turn over the records, I find that Gonzalez has met his burden of showing that the CCRB records were "suppressed" for purposes of his Brady claim.[7]

### 3.   The CCRB Records Were Favorable to the Defense

Gonzalez also bears the burden of showing that any suppressed evidence was "favorable" to the defense. Evidence is "favorable" for Brady purposes if it is exculpatory or if it "impeaches a government witness." Gil, 297 F.3d at 101 (citing Strickler, 527 U.S. at 281–82; Coppa, 267

---

[7] Gonzalez also argues that knowledge of the CCRB records should be imputed to the prosecutor because the prosecutor had an affirmative obligation to search for disciplinary records relating to an important law enforcement witness such as Crowe. (See Pet. June 6 Mem. at 5-8). In addition, Gonzalez's pretrial request for the CCRB records placed the Government on notice that impeachment evidence relating to Crowe might be found in the CCRB file. Because I find that knowledge of the CCRB records should be imputed to the prosecutor based on Crowe's own knowledge of the records and his role as a member of the prosecution team, I do not reach the question of whether the prosecutor was otherwise obligated to seek out Crowe's CCRB records.

F.3d at 139).  Moreover, "[t]he Government's obligations under Brady encompass not only

information that is admissible in its present form[,] but also material information that could

potentially lead to admissible evidence favorable to the defense."  Meregildo, 920 F. Supp. 2d at

438 (citing United States v. Rodriguez, 496 F.3d 221, 226 [n.4] (2d Cir. 2007)); see also Gil, 297

F.3d at 104 (Brady violation may be found where suppressed evidence would have been

admissible, "could lead to admissible evidence[,]" or "would be an effective tool in disciplining

witnesses during cross-examination by refreshment of recollection or otherwise.").

 Had it been provided to the defense, the Alejandro complaint and the related CCRB

records would have supported the defense theory that Crowe was "a liar," and, specifically, made

false statements to avoid getting into trouble for misconduct committed while he was off-duty.

While the Allen, Ortiz, and Zavala complaints (and related records) would not have been

admissible in their present form, their production could have potentially led to admissible

evidence and strengthened Gonzalez's theory that Crowe had a motive to lie because he already

had a number of complaints against him and would be wary of the consequences of any new

accusations.  Thus, even assuming that the CCRB documents could not have been used to

impeach Crowe at trial under the Federal Rules of Evidence, see infra Section II(B)(4)(a), these

records could have provided a new avenue for Gonzalez's attorneys to explore in their search for

impeachment evidence and sources of bias.  Accordingly, Gonzalez has met his burden of

showing that the CCRB records would have been favorable to the defense.

  4.  The CCRB Records Are Not "Material" For Brady Purposes

 Having found that the CCRB records were both suppressed and favorable to the defense,

I turn to whether this evidence was "material," that is, whether there was a reasonable likelihood

that the production of this evidence to the defense would have changed the outcome at

Gonzalez's trial. For the reasons that follow, I find that Gonzalez has not met his burden of demonstrating that, had the CCRB records been disclosed prior to trial, there was a reasonable probability that the results of his trial would have been different.

       a.  Gonzalez Has Not Shown Prejudice Arising From Suppression of the Allen, Ortiz, and Zavala CCRB Complaints

Gonzalez argues that he was prejudiced by the Government's failure to disclose the Allen, Ortiz, and Zavala complaints because they could have been used as a basis to cross-examine Crowe and cast doubt on his testimony at trial. (Pet. Mem. at 17-18; see also id. at 3-5, 6-7). Any cross-examination of Crowe with regard to the complaints would have fallen under Rule 608 of the Federal Rules of Evidence, which provides that during cross-examination, the court may permit inquiry into "specific instances" of a witness's conduct so long as they are probative of the witness's "character for truthfulness or untruthfulness." Fed. R. Evid. 608(b).[8]

---

[8]  At the time of Gonzalez's trial, Rule 608(b) provided as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed. R. Evid. 608(b) (1994). Subsequent amendments in 2003 and 2011 did not change the substance of the rule as it relates to cross-examination regarding a witness's character for truthfulness. See Fed. R. Evid. 608 Advisory Committee's Notes. Both the current and prior version of the rule provide that while extrinsic evidence, aside from a prior criminal conviction, may not be used for the purpose of attacking a witness's credibility, the court "may, on cross-examination, allow [specific instances of conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b) (2013). Because the substance of the two versions of the rule is the same, I will cite to the current version of Rule 608. See, e.g. United States v. Coppola, 671 F.3d 220, 245 n.17 (2d Cir. 2012) (when

"The scope and extent of cross-examination [pursuant to Rule 608(b)] is within the trial court's sound discretion." United States v. Laster, No. S1 06 Cr. 1064 (JFK), 2007 WL 2872678, at *2 (S.D.N.Y. Sept. 28, 2007) (citing United States v. Wilkerson, 361 F.3d 717, 734 (2d Cir. 2004)).

In assessing whether Gonzalez could have cross-examined Crowe regarding the CCRB complaints filed by Allen, Ortiz, and Zavala, the Court must consider two threshold questions: (1) did the incidents that gave rise to the CCRB complaints involve dishonest conduct bearing on Crowe's character for truthfulness?; and (2) even if the underlying conduct did not involve dishonesty, did the CCRB find that Crowe was not credible? See, e.g., United States v. Barret, No. 10 Cr. 809 (S-4) (KAM), 2012 WL 194992, at *2-3 (E.D.N.Y. Jan. 23, 2012) (officer could not be cross-examined regarding conduct that gave rise to substantiated CCRB complaints because conduct did not bear on officer's credibility. However, officer could be cross-examined "regarding the fact that CCRB investigators found incredible certain statements made by [the officer] during the course of their investigations"). If the answer to both questions is "no," there can be little doubt that inquiry as to the prior CCRB complaints would not have been permitted because the complaints did not bear on Crowe's character for truthfulness. See, e.g., United States v. Polanco, No. 10 Cr. 627 (RPP), 2011 WL 1795293, at *4 (S.D.N.Y. May 3, 2011) (where CCRB complaint did not allege that officer engaged in dishonest conduct, and CCRB did not make adverse credibility finding against officer, CCRB records had no bearing on officer's credibility and could not be used to impeach under Rule 608) (citing cases); United States v. Nelson, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005) (Rule 608 "does not authorize inquiry on

---

analyzing whether evidence would have been admissible at trial pursuant to Rule 401, court relied on "the restyled Federal Rules of Evidence, which took effect December 1, 2011, because their substance is the same as the version in effect at the time of [defendant's] trial").

24

cross-examination into instances of conduct that do not actually indicate a lack of truthfulness")

(internal quotation marks and citation omitted).

Gonzalez characterizes the CCRB complaints as examples of Crowe "conspiring with

other police officers to lodge false charges against innocent victims" (Pet. Mem. at 18), but this

characterization is inaccurate. As discussed above, the Allen complaint did not allege any

dishonesty; rather, it accused Crowe of using excessive force and a racial slur. (O'Donnell

Decl., Ex. E). The Zavala complaint alleged that Crowe was rude, used profanity, and refused to

provide his badge number. (O'Donnell Decl., Ex. F). Although the Ortiz complaint did allege

that Crowe helped fabricate charges, Ortiz eventually pled guilty to the charges at issue

(assaulting an officer and resisting arrest), and Crowe was cleared of wrongdoing in subsequent

administrative proceedings. (See O'Donnell Decl., Exhibit H, at 19-20). Moreover, the CCRB

findings as to the Allen, Ortiz, and Zavala complaints did not accuse Crowe of dishonesty in his

statements to the CCRB. Thus, pursuant to Rule 608 (and as discussed in the May 23

Memorandum Order), the Allen, Ortiz, and Zavala complaints would not have provided a basis

for cross-examining Crowe at Gonzalez's trial. See May 23 Memorandum Order, 2013 WL

2350434, at *7 n.6.

In addition, Gonzalez argues that even if the Allen, Ortiz, and Zavala complaints could

not have been used to cross-examine Crowe, the complaints are "material" under Brady because

defense counsel could have used them as a basis for further investigation. See, e.g., Rodriguez,

496 F.3d at 226 n.4. Gonzalez contends that access to Crowe's CCRB records could

hypothetically have led defense counsel to other evidence, and thus there was a reasonable

probability that disclosure of the complaints would have therefore affected the outcome of the

trial. (See Pet. Reconsideration Mem. at 6-7). However, Gonzalez's arguments are entirely

speculative and he does not identify a single piece of new evidence that could have been

uncovered with the benefit of the CCRB complaints.  Significantly, Gonzalez has now had

access to these CCRB records for at least a decade (since they were first obtained in the earlier

post-conviction proceedings before Judge Knapp) but does not indicate that the records have

actually pointed his defense toward any "favorable" (i.e., impeaching) evidence.  In sum,

Gonzalez has not demonstrated that further investigation based on the Allen, Ortiz, and Zavala

complaints would have changed the evidentiary record at his trial.  Because Crowe could not

have been cross-examined at trial regarding the complaints, and Gonzalez has not demonstrated

any other way in which the complaints could have affected the proceedings, there is no basis to

conclude that suppression of the Allen, Ortiz, and Zavala complaints prejudiced Gonzalez.

      b.  Gonzalez Has Not Established That, Had the Alejandro Complaint Been
          Disclosed Prior to Trial, There Was a Reasonable Probability of a Different
          Outcome in His Case

          i.  Crowe's Statement to the CCRB In Regard to the Alejandro Complaint
             Bears on His Character for Truthfulness

In order to determine whether the Alejandro complaint would have provided a basis to

cross-examine Crowe pursuant to Rule 608, the Court must first determine whether the CCRB

records bore on Crowe's character for truthfulness.  Gonzalez argues that the CCRB records

were tantamount to an "official finding[]" that Crowe "lied."  (Pet. Mem. at 6).  Moreover, "false

statements may be the basis for questioning under Rule 608," even where the statements occur

outside of a formal court proceeding.  United States v. Kozlovski, No. 10 Cr. 58 (RRM), 2011

WL 4916915, at *2 (E.D.N.Y. Oct. 14, 2011) (permitting cross-examination regarding

submission of false time sheets to employer) (citing Hynes v. Coughlin, 79 F.3d 285, 293–94 (2d

Cir. 1996) (cross-examination regarding witness's filing of false claim for workmen's

compensation); United States v. Jones, 900 F.2d 512, 520–21 (2d Cir. 1990) (upholding trial

court's decision to allow cross-examination regarding false statements on applications for

employment, apartment, driver's license, loan, and membership in an association); United States

v. Sperling, 726 F.2d 69, 74–75 (2d Cir. 1984) (approving cross-examination regarding false

credit card application)).

    In response, the Government contends that Crowe could not have been cross-examined as

to whether he gave a false statement in the Alejandro matter because "the CCRB never made any

finding that Crowe was not credible," and "[a]t most, two board members noted that it was odd

that the complainant was able to identify Crowe's [personal] car[.]" (Defs. Mem. at 40, 41).

    The CCRB did not issue a report regarding the Alejandro complaint.  Thus, the

Government is correct that there was no CCRB "finding" (adverse or otherwise) as to Crowe's

credibility, and the CCRB records may not be so characterized.  However, the absence of a

credibility finding is not dispositive as to whether the CCRB records fall under Rule 608,

because such a finding is not required under the rule so long as the proposed cross-examination

goes to the witness's character for truthfulness.  For example, in Rosales v. Kelly, the Court

assessed whether a correction officer could be cross-examined pursuant to Rule 608 regarding an

unrelated disciplinary matter wherein the officer was accused of using force against an inmate

and failing to report it as required.  No. 07 Civ. 10554 (LAP), 2011 WL 5873374, at *1

(S.D.N.Y. Nov. 14, 2011).  The disciplinary records implied that the officer provided false

statements in the course of disciplinary proceedings, namely, that he told an investigator that "the

inmate tripped," whereas "the investigator found that no such trip could be seen on a video of the

incident."  Id.  The officer eventually entered into a settlement agreement with the New York

Department of Correctional Services, whereby he received a "Notice of Discipline" for failing to

file a use-of-force report. See id. Nevertheless, the Court concluded that the officer's "use of force against an inmate [and] fail[ure] to report it as required, coupled with his apparent attempt to fabricate an alternative explanation for the inmate's alleged injuries—i.e., that the inmate tripped—suggest[] a dishonest character." Id. Finding that "the violation at issue sufficiently speaks to [the officer's] character for untruthfulness," the Court held that the officer could be cross-examined regarding the matter pursuant to Rule 608. Id. at *1-2.

Here, the CCRB's decision to substantiate the Alejandro complaint necessarily implied that the Board (1) gave some credence to Alejandro's claim that Crowe harassed him while off-duty; and (2) rejected Crowe's contention that although he was acquainted with Alejandro from prior interactions, he never saw Alejandro and was sick at home on the date in question. In light of Crowe's complete denial of the allegations against him and, more importantly, his statement that the alleged interaction with Alejandro never occurred, there was simply no way for the CCRB to substantiate the complaint without also deciding not to credit Crowe's statements to the CCRB investigator. Thus, as in Rosales, these CCRB records could have been a proper subject for cross-examination even in the absence of an official finding that Crowe lied to the CCRB. See id.; see also United States v. Terry, 702 F.2d 299, 316 (2d Cir. 1983) (allowing cross-examination regarding prior occasion where court found that expert witness "guessed under oath") (internal citation marks omitted); United States v. Bravo, 808 F. Supp. 311, 321-22 (S.D.N.Y. 1992) ("Rule 608 of the Federal Rules of Evidence allows impeachment of witnesses by evidence of specific instances of dishonesty regardless of whether there has been an official finding to that effect.") (analyzing prior version of Rule 608); cf. United States v. White, 692

28

F.3d 235, 249 (2d Cir. 2012) (court's adverse credibility finding may be used on cross-examination even without explicit finding that officer-witness "lied").[9]

The Government raises a host of other arguments as to why Crowe could not have been cross-examined regarding the Alejandro complaint and related CCRB records, including that this line of inquiry would involve the admission of inadmissible hearsay, and that it would run afoul of the considerations set forth in White and United States v. Cedeño, 644 F.3d 79, 82–83 (2d Cir. 2010), regarding the trial court's exercise of discretion pursuant to Rule 608. (See Resp. Mem. at 42-45).[10]  However, I will not reach these arguments because even assuming that Gonzalez

---

[9] To be clear, the Court does not suggest that a decision by the CCRB not to credit an officer's statement will always imply that the officer lacked veracity. See, e.g., United States v. Teron, 478 Fed. Appx. 683, 685 (2d Cir. 2012) (where CCRB substantiated complaint that officer engaged in an improper search, but did not adopt its investigator's finding that officer was not credible, trial court did not abuse its discretion under Rule 608(b) by barring cross-examination of officer with regard to substantiated complaint). Indeed, it is easy to imagine circumstances where the CCRB would choose not to credit an officer's statement for reasons that would not reflect on the officer's character for truthfulness, e.g., where an officer provided a sincere but mistaken account of a chaotic situation, or where an officer's memory had blurred due to the passage of time. But see Redd v. New York State Div. of Parole, 923 F. Supp. 2d 393, 2013 WL 588233, at *8 (E.D.N.Y. 2013) (allowing witness to be cross-examined under Rule 608(b) regarding filing of false police report even though witness's false report could have been due to mistake). However, based on the specific circumstances presented here, I find that Crowe's statement to a CCRB investigator on June 1, 1989 bears on his character for truthfulness.

[10] As the Government points out (see Resp. Mem. at 35), at the time of Gonzalez's 1994 trial, the relevant precedent with regard to cross-examination under Rule 608(b) was United States v. Cruz, 894 F.2d 41 (2d Cir. 1990). In Cruz, the Second Circuit found that the trial court had not abused its discretion by refusing to allow cross-examination of a witness regarding a prior judicial finding that the witness's testimony was not credible. Id. at 42-43. The Circuit relied on two factors in reaching this determination. First, the adverse credibility finding was limited to the prior case, and there was no finding that the witness "was lacking in veracity generally." Id. at 43. Second, there was no connection between "the subject of [the witness's] testimony in [the prior case] and his testimony in the case at bar . . . ." and thus the prior adverse credibility finding was irrelevant. Id. In Cedeño, the Circuit addressed a trial court's misapplication of Cruz and explained that while Cruz rested on the two factors discussed above, it did not "hold or suggest . . . that these were the only factors to be considered or that they were determinative factors." Cedeño, 644 F.3d at 82. Thus, while Cedeño stands for the proposition that a broad

29

could have cross-examined Crowe regarding the CCRB records, it would not have changed the outcome at trial.

> ii.     Even if the CCRB Records Had Been Used to Impeach Crowe, It Would Not Have Altered the Outcome of Gonzalez's Trial

Any cross-examination of Crowe based upon the CCRB records would have been extremely limited in scope, and the CCRB records themselves would have been excluded, because Rule 608 does not allow for the admission of "extrinsic evidence . . . to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). Rather, "the court may, on cross-examination, allow [specific instances of a witness's conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness[.]" Id. (emphasis added). Moreover, "if a witness denies having engaged in alleged untruthful conduct on cross-examination, the examiner must take (or is bound by) the witness's answer." Nelson, 365 F. Supp. 2d at 386. Thus, the relevant question is not whether the admission of the CCRB records would have been prejudicial, but whether Gonzalez was prejudiced when he was denied the opportunity to ask Crowe about the CCRB's decision not to credit his testimony with respect to the Alejandro complaint.

Here, raising the question of the CCRB's decision would not have affected the outcome of the trial because the jurors already had been presented with ample evidence to question Crowe's credibility if they had wanted to do so. As described supra at 7-8, defense counsel (1) brought out many discrepancies in Crowe's various statements; (2) pointed out that Crowe

---

inquiry is required into the "probity and relevance of a prior court's finding that a witness had lied," id., it did not overrule prior precedent, but merely clarified the Cruz analysis. See id. at 82-83.

had been interviewed by a police review board with regard to the shooting and had a motive to lie in order to justify having fired his off-duty revolver; and (3) emphasized that there was no physical evidence that Gonzalez shot at Crowe, nor was the shooting ever reported over police radio. (See, e.g., Tr. 135-47, 149-69, 177-81, 542-44, 682). There was thus significant evidence to undercut Crowe's trial testimony, and defense counsel's cross-examination of Crowe was comprehensive. While it was entirely possible for the jurors to base their verdict on Crowe's testimony, as the Second Circuit observed in upholding the conviction, Gonzalez I, 110 F.3d at 941, it is also plausible that the jurors viewed Crowe's testimony (or at least some of it) with skepticism, and relied on other aspects of the Government's case to convict Gonzalez.

Moreover, even setting aside the uncorroborated portions of Crowe's testimony, the remaining evidentiary record amply supported the verdict that Gonzalez possessed a gun and was guilty of the crime with which he was charged. There were aspects of the prosecution that rested on Crowe's testimony—for example, that Gonzalez was holding a gun in plain view when Crowe confronted him, that a mutual shoot-out occurred between Gonzalez and Crowe, and that Gonzalez fired first. However, Crowe's testimony was not the only evidence to support the charged offense of gun possession. Rather, the jurors heard testimony from other police officers regarding how two firearms were found at the scene. (See, e.g., Tr. 381-82 (testimony of Officer Sapienza that once uniformed officers arrived at the scene and took custody of Colon, Crowe immediately retrieved firearm from nearby yard); Tr. 495-96 (testimony of Officer Donohue that, with the aid of flood lights, he found and retrieved second firearm from underneath the bushes)). Officer Sapienza's testimony made clear that Crowe would not have had time to plant guns in the bushes before the other officers arrived at the scene. (See Tr. 381-82).

31

In addition, the jurors heard testimony that Crowe described the distinctive cars that Esteban and Emilio Gonzalez were driving that night, that other officers quickly found cars matching Crowe's descriptions at two separate locations in the Bronx, and that the drivers of the two cars turned out to be brothers. (See, e.g. Tr. 244-48, 330-32, 336-37). Taken together, the jurors could readily have concluded that this was convincing evidence that two guns were left at the scene, and that Gonzalez possessed one of the guns.

In sum, had the jurors learned of Crowe's statements to the CCRB and the CCRB's decision not to credit his testimony, they could have concluded that Crowe tailored his testimony to avoid getting into trouble, and that he misrepresented some of the circumstances of an armed confrontation or shooting. However, Gonzalez was not charged with a shooting, but only with gun possession, and the guilty verdict was supported by, inter alia, Colon's presence at the scene, the recovery of two guns from the location, and Gonzalez's capture shortly thereafter, in the area, driving a car that Crowe had described. This evidence, provided by other witnesses, corroborated key aspects of Crowe's testimony relevant to the gun possession charge. Given the totality of the evidence, there is no reasonable probability that use of the Alejandro complaint to further impeach Crowe's credibility would have altered the jury's verdict.

### C.    Failure to Disclose James Rodriguez's Testimony

In further support of his Brady claim, Gonzalez offers the testimony of James Rodriguez, a civilian witness who testified for the Government in an unrelated criminal case in 1996. (See Pet. Mem. at 7-8; Pet. Reply Mem. at 8-13 & Ex. F (James Rodriguez's Testimony)). Rodriguez testified that, in the context of the unrelated case, Officer Crowe lied and fabricated charges. (See Pet. Reply Mem. at 11 & Ex. F (Rodriguez testimony at transcript pages 408-09)). Since Rodriguez did not provide this testimony until 1996, it could not possibly have been turned over

to Gonzalez before his trial in 1994. See United States v. Santos, 486 Fed. App'x. 133, 135 n.1

(2d Cir. 2012) (Brady obligation does not apply to new evidence arising from post-trial events)

(citing Dist. Attorney's Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 68-70

(2009)).  Thus, this evidence does not support a Brady claim.

### D.    Failure to Disclose Firearm Discharge Review Board Report

In his reply papers in support of the motion, Gonzalez contends for the first time that the

Government violated Brady by failing to turn over an NYPD Firearm Discharge Report that was

prepared the day after his arrest.  (Pet. Reply Mem. at 14 & Ex. J).  Gonzalez has "forfeited [this

argument] . . . by presenting [it] for the first time in his reply brief."  Green v. Walsh, 460 Fed.

App'x. 71, 72 (2d Cir. 2012); see also Evangelista v. Ashcroft, 359 F.3d 145, 155 n.4 (2d Cir.

2004) ("We do not consider the merits of [the habeas petitioner's] argument, because '[w]e will

not consider an argument raised for the first time in a reply brief.'") (quoting United States v.

Yousef, 327 F.3d 56, 115 (2d Cir. 2003)).  Moreover, as set forth in the May 23 Memorandum

Order, this claim is procedurally barred because Gonzalez could have, but did not, raise this issue

before the trial court or on direct appeal.  See May 23 Memorandum Order, 2013 WL 2350434,

at *5.

Yet even if the claim had not been forfeited, it lacks merit.  The Firearm Discharge

Report states that in addition to finding a 9 millimeter handgun at the scene, Officer Donohue

also found a spent 9 millimeter shell casing.  (See Pet. January 23 Letter, Ex. B).  The presence

of a 9 millimeter shell casing would have been helpful to the Government and supported its

theory that Gonzalez not only possessed a 9 millimeter handgun, but also used it to fire at Crowe.

However, Officer Donohue testified at trial that the police did not find any shell casings at the

scene.  (See Tr. 498-505).  Indeed, it is now uncontested that the Firearm Discharge Report was

33

inaccurate and that no shell casings were found.  (See Resp. February 5 Letter at 2-3; Pet. Reply Mem. at 14).

Gonzalez argues that, had the Firearm Discharge Report been disclosed prior to trial, it could have been used either to (1) impeach Officer Donohue's trial testimony that no shell casings were found; or (2) suggest that officers at the scene were engaged in a conspiracy to falsify records and plant incriminating evidence against Gonzalez.  (Pet. January 23 Letter at 2-3).  However, as explained in the May 23 Memorandum Order, the Government's alleged failure to disclose the Firearm Discharge Report does not support a Brady claim:

> First, since the report does not contain any statements by Officer Donohue, it could not have been used to impeach his testimony at trial.  Second, although the report incorrectly states that a 9 millimeter shell casing was found at the scene, it also states that the shell casing was documented in NYPD evidence voucher number F360935.  In fact, voucher F360935 indicates that no 9 millimeter shell casing was found.  In light of this obvious inconsistency, had the Firearm Discharge Report been produced prior to trial, it would not have provided evidence of a conspiracy to plant incriminating evidence against Gonzalez. Rather, the incorrect statement in the Firearm Discharge Report appears to have been a mistake.

Id. (citations omitted).  Accordingly, the alleged failure to disclose the Firearm Discharge Report does not establish a viable claim under Brady.

### E.     Records from the Internal Affairs Bureau

In the May 23 Memorandum Order, I granted limited discovery of Crowe's disciplinary records from the NYPD Internal Affairs Bureau ("IAB"), and directed the NYPD to deliver the records directly to the Court to be reviewed in camera.  (May 23 Memorandum Order, 2013 WL 2350434, at *9-11).  The NYPD Legal Bureau produced responsive documents to the Court on July 19 and August 8, 2013.

The records revealed that the IAB substantiated one complaint against Crowe prior to Gonzalez's 1994 trial.  The substantiated complaint dates from 1977 (Case File No. C77-0456) and is documented in a one-sentence summary, which states only that Crowe was "alleged to be involved in corrupt activities while assigned to the 28[th] [Precinct]."  Due to the age of the complaint, the NYPD has provided a certification (to be docketed) that the full investigative file cannot be found.

In addition, the IAB produced summary descriptions of all other investigations involving Crowe prior to the time of Gonzalez's trial.  The IAB also produced the full investigative file for a complaint that Stiso filed against Crowe in May 1995, asserting that Crowe committed perjury in connection with Gonzalez's case.  (See also Pet. Reply Mem., Ex. H (Letter from Stiso to the Internal Affairs Bureau dated May 17, 1995 regarding perjury complaint)).  I have reviewed the IAB records in camera and find that there is no material impeachment or exculpatory evidence contained therein.  Accordingly, the IAB records will not be disclosed to the parties, but instead will be filed under seal for review by Judge Rakoff.

In addition, I find that the IAB records do not provide a viable alternate basis for Gonzalez's Brady claim.  The only materials held by the IAB that could potentially have been disclosed to Gonzalez prior to trial were in relation to the 1977 "corrupt activities" complaint.  Even assuming that the case file was still available at the time of Gonzalez's trial in 1994, and the other criteria could be met to properly characterize it as Brady material, its probative value would be modest at best given the 17-year gap between the 1977 complaint and the 1994 trial.  See White, 692 F.3d at 249 (when determining whether prior adverse credibility finding may be subject of cross-examination pursuant to Rule 608(b), one relevant factor is "'how much time

35

had elapsed since the lie was told and whether there had been any intervening credibility determination regarding the witness'") (quoting Cedeño, 644 F.3d at 82-83).

### F.    Conclusion

To evaluate whether suppressed evidence is material, a court must assess the likely impact of the suppressed evidence "in the context of the entire record." United States v. Agurs, 427 U.S. 97, 112 (1976). Having considered the totality of the evidence that was not produced to the defense prior to trial, as well as the trial record and the records produced to the Court by the NYPD, I find that Gonzalez has not demonstrated that the Government's failure to disclose impeachment evidence undermines confidence in the jury's verdict. I therefore recommend that Gonzalez's Brady claim be denied.

### III.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Gonzalez argues that his Sixth Amendment rights were violated because his attorney, Pasquale Stiso, provided ineffective assistance at trial. He asserts that Stiso was ineffective by failing to: (1) obtain CCRB, IAB, and other personnel records for Crowe and the other law enforcement witnesses at trial; (2) cross-examine Crowe and other law enforcement witnesses concerning CCRB, IAB, or personnel records involving misconduct or a history of fabricating charges; (3) elicit evidence that would contradict the Government's allegation that Gonzalez had been burglarizing an apartment in the area on the night of his arrest; (4) investigate evidence that a bald man was seen with a gun in the area around the same time as the shooting; (5) call a ballistics expert at trial and elicit exculpatory ballistics evidence; (6) impeach Crowe's testimony

with evidence that Crowe had been granted access to investigative materials; and (7) present a credible defense.[11]

### A.    Legal Standards

Under the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), in order to prevail on a claim of ineffective assistance of counsel, a petitioner must: (1) prove that "'his counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation.'" <u>Carrion v. Smith</u>, 549 F.3d 583, 588 (2d Cir. 2008) (internal quotation marks omitted) (quoting <u>United States v. Cohen</u>, 427 F.3d 164, 167 (2d Cir. 2005)).

"The Strickland standard is 'highly demanding,' and 'rigorous.'" <u>Bennett v. United States</u>, 663 F.3d 71 (2d Cir. 2011) (quoting <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 382 (1986); <u>Lindstadt v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001)).  Under the first prong, the court must be "mindful of the diversity of the bar and the variety of approaches effective attorneys might employ when dealing with a particular set of facts." <u>Parisi v. United States</u>, 529 F.3d 134, 141 (2d Cir. 2008).  Thus, "[t]o give appropriate deference to counsel's independent decisionmaking, [the court must] 'indulge a strong presumption that counsel's conduct falls within the wide range

---

[11] In the post-conviction proceedings before Judge Knapp, Gonzalez raised several of the same claims, arguing that Stiso was ineffective for failing to "obtain material and favorable evidence about law enforcement witnesses prior to trial," "obtain and/or elicit evidence contradicting the government's allegation that [Gonzalez] had been burglarizing an apartment in the area," and "elicit exculpatory ballistics and other forensic evidence." <u>Gonzalez II</u>, 285 F. Supp. 2d at 359. Gonzalez also asserted that Stiso "presented an incredible defense[.]" <u>Id.</u>  As discussed in Section I(C), <u>supra</u>, Judge Knapp denied Gonalez's ineffectiveness claim on the merits. <u>Gonzalez II</u>, 285 F. Supp. 2d at 376-79.  However, the judgment was vacated on jurisdictional grounds and the Second Circuit held that "Gonzalez may raise his claim of ineffective assistance of counsel, without prejudice, in a future Section 2255 motion." <u>Gonzalez IV</u>, 291 Fed. App'x at 394.  Accordingly, the Court has assessed Gonzalez's claim of ineffective assistance of counsel <u>de novo</u>.

of reasonable professional assistance.'" Id. (quoting Strickland, 466 U.S. at 689).  Moreover, in evaluating counsel's effectiveness, the court must assess the case from the viewpoint of the attorney at the time of the challenged conduct or omission, Lockhart v. Fretwell, 506 U.S. 364, 371 (1993), and "'every effort [must] be made to eliminate the distorting effects of hindsight.'" Morales v. United States, 635 F.3d 39, 44 (2d Cir. 2011) (quoting Strickland, 466 U.S. at 689). "Rather than strictly scrutinizing every move that an attorney makes, the court must focus on whether counsel's behavior was so unreasonable as to represent a 'breakdown in the adversarial process that our system counts on to produce just results.'" Capalbo, 2012 WL 611539, at *8 (quoting Strickland, 466 U.S. at 696).

Under the second prong, proving prejudice requires the petitioner to show that but for counsel's errors, there was a reasonable probability that the outcome would have been different – a "'probability sufficient to undermine confidence in the outcome.'" Bierenbaum v. Graham, 607 F.3d 36, 51 (2d Cir. 2010) (quoting Strickland, 466 U.S. at 694).  This requires the court to examine "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart, 506 U.S. at 372 (citation omitted).  In the context of prejudice stemming from counsel's failure to investigate and introduce certain evidence, a court must consider "all the relevant evidence that the jury would have had before it" had the evidence been introduced at trial. Wong v. Belmontes, 558 U.S. 15, 20 (2009) (per curiam) (emphasis in original).

**B.  Discussion**

1. Failure to Obtain CCRB, IAB, and Personnel Records

Gonzalez argues that Stiso was ineffective in failing to obtain disciplinary records of the officers who testified at trial.  It is unclear how Stiso could have obtained such records, which

38

are confidential and are generally protected from disclosure under State law. See N.Y. Civil

Rights Law § 50-a(1) (Police personnel records "shall be considered confidential and not subject

to inspection or review without the express written consent of such police officer . . . except as

may be mandated by lawful court order"). There "is no general constitutional right to discovery

in a criminal case." Weatherford v. Bursey, 429 U.S. 545, 559 (1977). Moreover, as discussed

in the May 23 Memorandum Order, trial courts in this Circuit have found that a criminal

defendant is not entitled to the personnel records of law enforcement officers in the ordinary

course of pre-trial discovery. See United States v. Collier, No. 10 Cr. 820 (NGG), 2013 WL

125691, at *2-3 (E.D.N.Y. Jan. 9, 2013); Nelson, 2011 WL 2207584, at *6; see also May 23

Memorandum Order, 2013 WL 2350434, at *6. Accordingly, had Stiso attempted to subpoena

CCRB and IAB records, the subpoenas would almost certainly have been quashed. Thus, Stiso's

performance was not deficient for failing to pursue personnel records through pre-trial subpoenas

that would not have been successful.

    Although Gonzalez might have been able to obtain IAB, CCRB, or other personnel

records from the Government if the records were subject to disclosure under Brady, it is

undisputed that Stiso did, in fact, make specific requests to the Government for this evidence.

After Stiso requested the officers' personnel records, the Government made "'the initial

determination as to what evidence [had to] be disclosed'" and decided that the officers'

personnel records did not need to be turned over to the defense. See United States v. Wilson,

No. 04 Cr. 1016 (NGG), 2013 WL 1338710, at *10 (E.D.N.Y. Apr. 1, 2013) (quoting United

States v. Leung, 40 F.3d 577, 582 (2d Cir. 1994)). Gonzalez does not point to any reason why

Stiso should have doubted the correctness or good faith of the Government's determination not

to disclose the records. If there were specific reasons to believe that the prosecutor was violating

Brady, the better practice would have been for Stiso to request that the trial court review the officers' personnel records in camera. See, e.g., Wilson, 2013 WL 1338710, at *10 ("'[T]o the extent that there is a question as to the relevance or materiality of a given group of documents, the documents are normally submitted to the court for in camera review '") (emphasis added) (quoting United States v. Wolfson, 55 F.3d 58, 60 (2d Cir. 1995)); United States v. Leonard, 817 F. Supp. 286, 302-03 (E.D.N.Y. 1992) (ordering Government to submit FBI agent's personnel file for in camera review where agent's credibility was primary issue at trial and Government attorney expressed reluctance to review agent's file for impeachment material). However, I cannot find that Stiso acted improperly by accepting the Government's apparent judgment that the officers' personnel records did not need to be disclosed. See Banks v. Dretke, 540 U.S. 668, 695 (2004) ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed.").

In reaching this conclusion, I am mindful that Brady and its progeny impose a burden on the Government to disclose material impeachment evidence that is favorable to the defendant. Kyles, 514 U.S. at 433 (citation omitted). Defense counsel does not bear a corresponding burden to seek out such information; on the contrary, the Government bears the burden of disclosure even in cases where defense counsel has not requested impeachment evidence. Id. at 437-38; see also Banks, 540 U.S. at 696 (discussing presumption that prosecutor has properly discharged his or her duties and prosecutor's special role in seeking truth in criminal trials). Although Gonzalez tries to reframe Stiso's failure to obtain the officers' personnel records as a failure to investigate, Gonzalez does not cite a single case where an attorney's performance was found to be deficient under similar circumstances. While there are many areas where defense counsel has an

affirmative duty to conduct an independent investigation, it is hard to imagine how defense counsel could conduct an investigation into the confidential personnel records of law enforcement officers whose privacy is protected under State law.  Rather, the proper mechanism for obtaining the officers' personnel records in this case was exactly the path taken by Stiso: requesting the records from the Government as a <u>Brady</u> disclosure.

### 2.  Failure to Question the Officers Regarding Prior Personnel Complaints

Gonzalez further contends that Stiso failed to question Crowe and other officer witnesses regarding their disciplinary histories.  This claim fails because without access to the officers' personnel records, Stiso had no good-faith basis upon which to engage in such questioning.  <u>See</u> <u>Hynes</u>, 79 F.3d at 294 (for cross-examination pursuant to Rule 608, questioner must have good-faith basis for questions with regard to prior instances where witness was untruthful); <u>United States v. Scotti</u>, 47 F.3d 1237, 1248 (2d Cir. 1995) ("trial court may, in its discretion, preclude questions for which the questioner cannot show a good faith basis") (additional citations omitted).  Accordingly, Stiso's performance was not deficient for failing to pursue this line of questioning.

### 3.  Failure to Impeach Mascia and Undermine the Government's Evidence of a Burglary

Mascia, who lived around the corner from Crowe, testified at trial that someone attempted to break into his home on the night of Gonzalez's arrest.  (Tr. 52-53).  Mascia testified that after his home security alarm went off, he went downstairs and saw someone climbing out of one of the first-floor windows of his home.  (<u>Id.</u>).

Stiso challenged the admissibility of Mascia's testimony, arguing that evidence of the alleged burglary was unfairly prejudicial, but Mascia was permitted to testify over Stiso's

objection. (See Tr. 43-44, 49-51).[12] Having tried and failed to exclude Mascia's testimony entirely, Stiso focused his cross-examination on Mascia's inability to identify Gonzalez and Colon. (See Tr. 61-63). Stiso elicited testimony that Mascia was unable to identify Gonzalez and Colon during a show-up on the night of the burglary (Tr. 61-62), that Mascia could not identify Gonzalez and Colon in court (Tr. 62), and that police officers came to Mascia's home on the night of the burglary to dust for fingerprints, but the fingerprints were never matched to anyone. (Tr. 61).

Now, Gonzalez contends that Stiso should have done even more to bring out various circumstances relating to the burglary. (See Pet. Mem. 27-29). However, Stiso elicited the key facts that were helpful to the defense: specifically, that Mascia did not identify Gonzalez as the intruder and that Gonzalez's fingerprints were not found in Mascia's home. Stiso's cross-examination of Mascia therefore allowed Gonzalez to distance himself from the burglary altogether. Accordingly, Stiso's performance was not deficient as Gonzalez has not demonstrated how additional evidence relating to the burglary would have aided his defense.[13]

---

[12] The trial court's ruling to allow Mascia's testimony was subsequently affirmed by the Second Circuit in Gonzalez I, 110 F.3d at 941-42.

[13] Gonzalez cites to testimony in the post-conviction proceedings before Judge Knapp that: (1) Mascia's home was rented out to a tenant, Salvatore Atria, who was involved with drugs and mysteriously disappeared; (2) Mascia did not know if anything was actually stolen from his home; (3) Mascia acknowledged during post-conviction proceedings that he did not know who climbed out of the window and that it could theoretically have been Atria or one of Atria's guests; and (4) Atria never complained to the police that he had been burglarized or that things had been taken from his apartment. (See Pet. Mem. at 27-29). Gonzalez contends, inter alia, that had this evidence been elicited at trial, it could have provided a basis to exclude evidence of the burglary entirely by demonstrating that no burglary occurred. (Id. at 27). However, Gonzalez's argument fails because the admission of evidence of the "thwarted burglary" was not based on whether anything was stolen from Mascia's home. Gonzalez I, 110 F.3d at 941-42. Rather, Mascia's testimony was permitted based on its tendency "to show that Gonzalez and

42

### 4. Failure to Investigate the "Bald Headed Man"

Next, Gonzalez argues that Stiso was ineffective because he allegedly failed to investigate a report of a bald man with a gun at Lafayette Avenue and Wilcox Avenue, less than two blocks from Crowe's apartment. (See Pet. Mem. at 30).[14]  In support of his claim, Gonzalez has submitted a transcript of all police radio communications in the area between 11:49 p.m. on the night of February 24, 1994 and 12:37 a.m. on the early morning of February 25, 1994. (See Exhibits to Supplemental Memorandum in Support of Petitioner Esteban Gonzalez's Motion Pursuant to 28 U.S.C. § 2255, filed September 27, 2012 ("Pet. Supp. Mem. Exs."), Ex. A at 26-27 (94 Cr. 134, Dkt. No. 269).  The records state that there was a report of a "male white [with a] bald head, armed with a gun, hiding between cars . . . ." Id. at 26.  Aside from listing the general time interval (i.e., 11:49 p.m. to 12:37 a.m.) the records do not indicate a specific time when the report of the bald man was received or broadcast. See generally id.  However, the records do suggest that the report of the bald man was broadcast shortly after Gonzalez was stopped on Tremont Avenue by Officer Argiento. (See id. at 25-26).  Gonzalez further asserts that the bald man "could not have been either petitioner Gonzalez or co-defendant Colon since each of them had a full head of hair." (Pet. Mem. at 30).

---

Colon were functioning as armed look-outs" when they encountered Crowe. Id. at 942. Similarly, evidence that Mascia's tenant was involved with drugs would have had no effect on the admissibility of Mascia's testimony.

[14] The Court takes judicial notice that the intersection of Wilcox Avenue and Lafayette Avenue—the location provided by the 911 caller for the bald man with a gun—is less than two blocks from Crowe's residence at 3153 Lafayette Avenue. See Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); Paxi, LLC v. Shiseido Americas Corp., 636 F. Supp. 2d 275, 280 n.2 (S.D.N.Y. 2009) (taking judicial notice of distance between two locations) (citing Tucker v. Outwater, 118 F.3d 930, 935 (2d Cir. 1997)).

While the report of the bald man created a potential avenue for investigation by the defense, Gonzalez's claim fails because he cannot establish prejudice. As described above, the identification of Gonzalez as one of the perpetrators was strongly supported by the evidentiary record, including Crowe's detailed description of Gonzalez's clothing and vehicle, and the fact that other officers quickly found Gonzalez in the same car that Crowe described. Even if the jurors had heard that there was another man with a gun in the area, this information would not have undermined the jurors' conclusion that Gonzalez was correctly identified. Moreover, based on the radio communications—which document a number of different gun-related crimes in the area—it is not clear whether the report of a bald man was connected to the charges against Gonzalez rather than a report of a separate incident. (See Pet. Supp. Mem. Exs, Ex. A at 26). Thus, Gonzalez has not demonstrated that Stiso's alleged failure to investigate the report of the bald man was (or could have been) prejudicial to his defense.

### 5. Failure to Call a Ballistics Expert

At trial, Stiso called Vincent Scalice as an expert witness for the defense. Scalice was a retired NYPD detective who was also a certified crime scene analyst, forensic examiner, and latent fingerprint examiner. (Tr. 559-60). Scalice testified regarding the process for recovering latent fingerprints, and implied that the chance of finding latent prints on the guns in this case would have been far greater had the guns been processed differently at the crime scene by the police. (See Tr. 570-76, 585-86). Scalice also testified that when a 9 millimeter handgun is fired, the shell casing is only ejected about three feet, making a search for the shell casing relatively easy. (Tr. 579-81). He testified further that snowy conditions would likely make a shell casing even easier to find, because the white snow would contrast with the casing. (Tr.

44

580). Finally, in response to a question from Stiso, Scalice acknowledged that a suspect's hands may be examined for gun powder residue. (Tr. 585).

Now, Gonzalez argues that Stiso was ineffective in failing to call "a forensic scientist named Dr. Peter DeForest, who was prepared to testify that the police officers could have tested petitioner Gonzalez's clothing and hands for the presence of gunpowder residue and that testing kits were readily available for such testing at the time of petitioner Gonzalez's arrest." (Petitioner's Mem. at 32). "'The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.'" Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam)). Moreover, "'[w]here an expert would only marginally assist the jury in its role as fact finder, an attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant.'" Mitchell v. Artus, No. 07 Civ. 4688 (LTS) (AJP), 2008 WL 2262606, at *30 (S.D.N.Y. June 2, 2008) (quoting Massaro v. United States, 97 Civ. 2971, 2004 WL 2251679 at *4 (S.D.N.Y. Oct. 5, 2004), aff'd, 152 Fed. Appx. 20 (2d Cir. 2005)), adopted, 2008 WL 3884373 (S.D.N.Y. Aug. 21, 2008).

Here, Gonzalez has not demonstrated that Stiso was deficient for failing to call Dr. DeForest because the forensic expert that he did call, Scalice, cast doubt on the Government's theory of a shooting, explained that in his view the police did not perform an adequate analysis of the guns or the crime scene, and also informed the jury that a suspect's hands can be tested for gun powder residue. (Tr. 585-86). Where a witness who was not called "would have testified in a manner corroborative of another witness," counsel may make a strategic decision that "the testimony [is] unnecessarily cumulative." Luciano, 158 F.3d at 660. In addition, even if Dr.

45

DeForest had cast further doubt on Crowe's claim that Gonzalez shot at him, it would not have changed the jury's verdict as to the charged offense of gun possession in light of the other evidence presented at trial. Accordingly, Gonzalez has demonstrated neither deficient performance nor prejudice.

### 6. Failure to Impeach Crowe Regarding Access to Investigative Materials

Gonzalez also argues that Stiso should have cross-examined Crowe regarding his access to investigative materials and demonstrated that Crowe used his access to tailor his testimony to match the testimony of other officers. However, in light of the litany of discrepancies between Crowe's trial testimony and his previous statements, Stiso's focus on the inconsistencies during cross-examination was reasonable as opposed to attempting to get Crowe to admit that he had tailored his testimony (something which Crowe surely would have denied). See Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) (decisions by counsel "about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim.") (quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987)); see also Luciano, 148 F.3d at 660 (same).

In addition, questioning Crowe as to whether he tailored his testimony to match police documents would not have changed the evidentiary picture at trial, because the jurors already had a basis for not crediting Crowe's testimony with regard to the details of the incident. Accordingly, Gonzalez has not shown either deficient performance or prejudice arising from the failure to pursue this line of questioning.

### 7. Failure to Present a Credible Defense

The defense theory at trial was that Crowe wrongly assumed that Gonzalez and Colon were criminals, shot at them, and then made up a story to make the shooting seem justified. (Tr.

46

646-47, 679-80, 684-85).  The defense also alleged that Crowe planted the guns that were the basis for the gun possession charge.  (See, e.g., Tr. 20-21).

Gonzalez now argues that Stiso's mounted an incredible defense at trial.  (Pet. Mem. at 35-37).  Gonzalez contends that in order to make the defense theory of a cover-up believable, Stiso should have raised Crowe's "history of citizen complaints against him and his history of fabricating evidence and of other misconduct[.]" (Pet. Mem. at 36).  Gonzalez also claims that Stiso should have raised a mistaken-identity defense based upon police radio communications that there was a bald man with a gun in the area, presumably arguing that it was the bald man, and not Gonzalez, who discarded a gun at the scene.  (Id.).

However, it would not have been feasible for Stiso to base his defense theory on Crowe's personnel records showing prior civilian complaints because, as discussed in Section III(A) and (B), supra, Stiso did not have (and could not have gotten access to) the records prior to trial, though he had requested them.  In addition, Gonzalez's proposed mistaken-identity defense would not account for how Crowe could accurately describe Gonzalez's clothing and car before Gonzalez was apprehended, and would still require an argument that Crowe was part of a cover-up.  Thus, although Gonzalez argues that Stiso's defense theory was incredible, he does not propose a viable alternative, and indeed continues to argue that Crowe fabricated a story and planted guns in order to cover up his own "criminal police misconduct" – which is exactly the defense Stiso offered.  (See Pet. Mem. at 8).  For Gonzalez to argue that the defense theory at trial was incredible, and yet contend that he should be exonerated based on that same theory, is inconsistent at best.

## IV.   REQUEST FOR HEARING

A hearing is not necessary to adjudicate a Section 2255 motion if the petition and the record "conclusively show" that the defendant is not entitled to relief. 28 U.S.C. § 2255(b). Rather, "[i]t is within the district court's discretion to determine whether a hearing is warranted" or to rely on "a wide variety of tools" to develop the record if necessary. Pham v. United States, 317 F.3d 178, 180, 184 (2d Cir. 2003) (citations omitted); see also Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) (hearing not required where it "plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief") (citation and internal quotation marks omitted). Accordingly, as Gonzalez has not alleged facts which, if proved, could entitle him to relief, the Court recommends that his request for a hearing be denied.

## V.   CONCLUSION

For the foregoing reasons, the Court respectfully recommends that Gonzalez's motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence be denied.

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections to the Report and Recommendation. See also Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007.

Any requests for an extension of time for filing objections must be directed to The Honorable Jed S. Rakoff. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14)**

DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE

APPELLATE REVIEW.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v.

Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010)

(citing Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003) and Mario v. P & C Food Mkts., Inc.,

313 F.3d 758, 766 (2d Cir. 2002)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: New York, New York
      August 29, 2013

JAMES L. COTT
United States Magistrate Judge